EVERETT J. HORTON & Co., INC. *vs.* FRANK F. GRINNELL.

MAY 13, 1938.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

458

CAPOTOSTO, J.   This is an action in assumpsit on the common counts in which the plaintiff claims $900.38 from the defendant for services rendered.  The case was tried before a justice of the superior court sitting without a jury who gave decision for the plaintiff for $22.11.  The case is before us on the plaintiff's exception to this decision and on certain other exceptions taken by it during the trial.

The plaintiff is an investment corporation unconnected with any stock exchange.  In addition to its regular business it also undertakes to act as agent and adviser, when so en-

gaged by a customer, in the purchase and sale of securities through stockbrokers connected with the various stock exchanges.

In the spring of 1935, the defendant was trading with the plaintiff in unlisted securities for cash. He was also buying and selling securities listed in the stock market "on margin" through the office of Hornblower & Weeks in this city, hereafter referred to as Hornblower, in which field the defendant had been operating for some thirty years. In May of that year, Roy W. Cole, a representative of the plaintiff, in talking with the defendant, expressed the opinion that the latter was paying too much interest, at the rate of five and one-half per cent, on his account with Hornblower, and suggested that he might be able to secure better terms elsewhere. The defendant, being of the same opinion, asked Cole to "look into it." Shortly thereafter Cole recommended that the defendant transfer his account to Harris, Upham & Company, hereafter referred to as Harris, a brokerage house of Wall street in the city of New York, which would carry his account at a rate of interest not to exceed four per cent. The defendant personally investigated the standing of this firm and, finding it a brokerage house "in very good standing", he decided to transfer his account from Hornblower to Harris. It is important to note at this point that the defendant exercised his own judgment in all his dealings with Hornblower, and that Harris was strictly a commission house and carried out orders on the sole judgment of its customers.

Everett J. Horton, an officer of the plaintiff corporation, testified that on May 16, 1935, the defendant came to his office and said that he had decided to transfer his account to Harris and that he wanted the plaintiff to manage that account for him; that the defendant at that time signed a letter addressed to Harris in which he said, ". . . herewith is letter addressed to Hornblower & Weeks, instructing them to deliver to you upon payment of the debit balance, the securities now carried on my account . . .," and that to his, Hor-

ton's recollection, he had no conversation with the defendant on this occasion about the terms under which the plaintiff would manage the defendant's account with Harris.

On May 23, 1935, the defendant signed a "Customer's Agreement" with Harris, which contains many provisions not pertinent in the instant case. Under this agreement, Harris was to send all statements to the defendant "Address —Tiverton, R. I." The defendant's account was duly transferred from Hornblower to Harris, and the latter firm immediately began to buy and sell securities for that account upon orders from the plaintiff, which in turn acted in such matters solely on the judgment of Horton. Statements of this account were regularly sent by Harris and received by the defendant in Tiverton.

Horton further testified that in a talk with the defendant at his, Horton's, office in July 1935, he explained to him three ways in which the plaintiff might be compensated for its services in managing the defendant's account with Harris, the most simple and economical one being a charge of one-eighth of a point or twelve and one-half cents a share "in and out", meaning a charge of that amount on the purchase or sale of each share of stock or other security. The defendant, according to Horton, made no protest against the one-eighth point charge on purchases, but thought the plaintiff should waive the one-eighth point charge on sales, to which Horton replied that one-eighth of a point on both purchases and sales "was the arrangement we had with all of our other customers doing business with us on this basis, and that is the way we would do business with him, or not at all, we would make no exception to Mr. Grinnell." Although Horton did not remember what answer the defendant made, the evidence is clear that from the time of this conversation in July 1935 until the plaintiff and defendant severed relations, on or about March 31, 1936, when the defendant again transferred his account to Hornblower, Horton continued to use

his sole and independent judgment in dealing with the defendant's account with Harris.

The transcript is full of details relating to the numerous transactions in connection with defendant's account with Harris. The sum total of these transactions is that when defendant's account was transferred from Hornblower to Harris in May 1935, the defendant's equity in the account was $16,945.57, and that when the account was again transferred from Harris to Hornblower, in March 1936, this equity had increased to $41,559.49. There is no dispute on this point. .

The defendant in his testimony claims that he never agreed through Horton to pay the plaintiff any compensation for its services in managing his account; that he did not have any conversation with Horton in July 1935, respecting the plaintiff's compensation for such services, although he frequently visited the plaintiff's office and talked with Horton on other matters during the time that he had his account with Harris; that his first information of any claim for compensation by the plaintiff, on a basis of "one-eighth going and coming" on his account with Harris, came from Cole, when, in July or August 1935, the latter delivered to him at his home in Tiverton, some securities that he had purchased "over the counter" from the plaintiff; that his reply to Cole was: "Nothing doing, Mr. Cole. I am paying the regular commission on this stock I am buying and selling in New York, and I don't propose to pay two commissions. . . . Rather than to pay two commissions I will change it (his account) back to Hornblower & Weeks again"; and that Cole replied: "Forget it." The defendant's wife testified to the same effect respecting this conversation with Cole.

The defendant further testified that his understanding with Horton from the very beginning was that George G. Bass of the Harris firm, whom he did not know until he called on him in New York in November 1935, would have the "discretionary control" of his account with Harris, and that in his talk with Bass in November the name of Horton

was not even mentioned. On this point, Horton testified that, as he generally carried on the defendant's business with Harris through Bass, he gave the defendant a letter of introduction to Bass in November 1935. The defendant makes no reference to this letter in his testimony.

Bass's deposition was taken in behalf of the plaintiff in New York on July 8, 1936, after due notice to the defendant, who did not appear at the taking of the deposition, either in person or by counsel. In this deposition, Bass testifies that he met the defendant in November 1935, when the defendant called at the office of Harris with a letter of introduction "dated November 14, 1935, from Everett J. Horton, treasurer of the plaintiff, who personally gave our firm the orders for the sale and purchase of securities for Mr. Grinnell's account"; that he had a short general conversation with the defendant in which the latter "expressed himself as very well pleased at the way Mr. Horton and our firm had conducted his account and hopeful that we would continue to do as well."

After an extended examination of the defendant, the trial justice was apparently in doubt as to just how or when Bass was given "discretionary control" over the defendant's account, for almost at the very end of this examination we find as follows: The Court: "What I am trying to get at is, where did this authority of giving Mr. Bass discretionary power first originate? Who first thought of that?" Witness: "It was me that thought of that authority." The Court: "You mean by that, you suggested to Mr. Horton, or to Mr. Cole, that Harris-Upham Company should have this power?" Witness: "No, Mr. Bass should have this power." The Court: "Mr. Bass?" Witness: "And my reason for that was, as I told you, I couldn't be located. Sometimes those things (fluctuations in the value of securities) happen within an hour, or two. That was the practical way to do it. I was satisfied for him to do it."

The testimony is undisputed, in fact it was given by an employee of Hornblower who was called as a witness by the defendant, that it is customary with stockbrokers to do business with their customers in one of three ways. First, on a cash account, the securities being usually "taken up" by the customer in two days; second, "on margin", a credit and collateral account, with the customer exercising his own judgment in placing his orders; and third, on a "discretionary account", where, by special agreement between the customer and broker or between the customer and some third person, the securities in the account are dealt with on the judgment of the broker or third person and not on the judgment of the customer. This witness identified the defendant's agreement with Harris as an ordinary "customer's agreement on a margin account." It is well to recall at this point that Harris was strictly a commission house; that it did no business in discretionary accounts on its own judgment; and that the defendant, who had nearly thirty years experience in the stock market, had himself investigated this firm before he gave them his account.

Returning to Horton's testimony, we find him testifying that in March 1936 he told the defendant that he, the defendant, was indebted to the plaintiff in the sum of "$644 and some odd cents" for its management of his account with Harris to the end of December 1935, and that at that time the defendant answered that he would like to refer to his records. The plaintiff's claim for such services up to the time when the defendant stopped doing business with Harris on March 31, 1936, is $900.38. On the other hand, the defendant testified that the first time he was told by Horton that the plaintiff expected compensation from him was about March 25 or 26, when Horton "commenced to talk about some of these eighths going and coming. I (the defendant) said: 'Nothing doing, you didn't do anything for me.' He said he was working in conjunction with the brokerage

house in New York. I said, you are not working in conjunction with my permission."

The defendant introduced no testimony showing that the basis for the plaintiff's charges as made was unreasonable or that it was inconsistent with the usual practice of brokers or agents exercising discretionary control over a customer's account with a stockbroker. The case was tried by the defendant on the theory that he had a margin account with Harris; that Bass of that firm, in his individual capacity, had discretionary control of his account, and that the only commission he had obligated himself to pay was the ordinary straight commission to Harris. The plaintiff tried its case on the theory that it had an agreement, express or implied, with the defendant whereby it was to exercise discretionary control over his account with Harris for the usual and reasonable compensation of one-eighth of a point in and out, separate and apart from the ordinary brokerage charges that the defendant was bound to pay to Harris, and that it, the plaintiff, received no compensation whatever from Harris.

At the conclusion of the testimony and after arguments of counsel, the trial justice reviewed the evidence at considerable length and expressed the opinion that "it was originally to the plaintiff that the defendant looked for the handling of the account, and, as far as he was concerned, Harris, Upham & Company were reliable agents of the plaintiff company for the handling of this account." After pointing out that there was no evidence showing what brokerage charges the defendant had paid to Harris, so that he might determine how much, if anything, was actually due the plaintiff, he ended by saying: "I feel as though there is only one alternative left, and that is decision for the *plaintiff*." (italics ours. Clearly intended for defendant.)

At this point the plaintiff's counsel, who had properly refrained from interrupting the trial justice while giving his interpretation of the evidence, requested permission to reopen the case for the purpose of completing the record as

intimated by the court, but the defendant objected on the ground that the court was without power to grant the plaintiff's request as it had already given its decision for the defendant. A long discussion followed, the trial justice finally permitting the plaintiff to reopen its case on the ground that it had "not formally entered this decision." The additional testimony showed that the defendant had paid Harris $878.27 in brokerage charges.

It appears of record that the case was again argued by counsel at the conclusion of all the testimony, although the arguments are not reported. The transcript then shows an interchange of views concerning the evidence, mainly between the trial justice and counsel for the plaintiff, in which the latter, courteously but firmly, tried to point out to the former that he had misconceived the true relations between the parties in the case, saying in one place: "If we could convince the Court that the Court inadvertently obtained the wrong impression of facts in this case, why shouldn't we be allowed to do it?" The trial justice, however, held that, having given his decision on the question of liability, it was beyond his power to change that decision, whatever counsel might then say. He therefore deducted the $878.27, which the defendant had paid to Harris, from the $900.38, which the plaintiff claimed in this case, and gave a decision for the plaintiff for $22.11. This is the only docket entry of the court's decision.

The transcript is voluminous and presents many confusing details respecting the numerous stock transactions that were the subject of inquiry. But the evidence in reference to the contractual relations between the plaintiff, the defendant and Harris clearly shows that the trial justice was in error. We find various and material omissions in the review of the evidence by the trial justice before he allowed the plaintiff to reopen the case. At that time he rested his conclusion as to liability on the ground that no one said to the defendant that "this arrangement, (referring to a discretionary account)

whatever one was adopted, would be in addition to anything which would have to be paid to any other brokers *who were employed by the plaintiff."* (italics ours) This statement overlooks various important considerations.

A contract for special services, especially when it calls for the exercise of expert judgment in matters subject to sudden changes, may be implied from the conduct of the parties, even though it may not have been stated in express terms. The evidence in the instant case clearly shows that during all the time that the defendant had his account with Harris, the securities in that account were dealt with solely on the judgment and orders of Horton, the defendant doing nothing in this respect. The trial justice makes but scant reference to the testimony of Horton; he disregards the conduct of the defendant throughout the entire period involved in this case; and he takes no cognizance of the written agreement of May 23, 1935 between the defendant and Harris.

Again, the phrase in italics in the statement of the trial justice above quoted is contrary to the evidence. The testimony of the defendant is all directed to prove his contention that his dealings were all with Harris; that he believed that Bass of the Harris firm, who was a friend of Horton's, was to exercise discretionary control over his account with Harris; that Horton "didn't do anything for him"; and that whatever extra compensation might otherwise be charged for managing a discretionary account, he was not liable for such compensation to any one in the circumstances of this case, as he had paid all brokerage charges demanded of him by Harris. This and other testimony of a similar nature does not support the statement of the trial justice to the effect that Harris was "employed by the plaintiff."

When the trial justice gave his original interpretation of the evidence, before the plaintiff requested permission to reopen its case, he was confronted with a mass of confusing details, most of which concerned collateral matters. It is not very strange that in the stress of the moment he overlooked

pertinent considerations of a determinative character in arriving at a conclusion favorable to the defendant on the question of liability. In fact, after the testimony was finally closed and the case was again argued by counsel, he himself expressed doubt as to the correctness of that conclusion, but he refused to change it in the belief that such conclusion constituted a "decision", which he was precluded from changing as a matter of law.

In this particular the trial justice erroneously construed what in reality was nothing more than a preliminary expression of opinion with a decision by the court. In the trial of a case without a jury, a trial justice quite often comments on the evidence and expresses some opinion before actually entering such opinion as the decision of the court. It is not uncommon in such instances for counsel, who has properly refrained from interrupting, to call to the attention of the trial justice some material bit of evidence or phase of the evidence that may have escaped the trial justice's attention, and it is not unknown for a trial justice to *enter* a decision entirely different from his previously expressed opinion.

General laws 1923, chap. 338, sec. 20, in so far as pertinent, provides that in a case tried by the superior court without the intervention of a jury, the court shall briefly note its conclusions of law and fact on its docket and "such record shall be known as a decision." In *Ashaway National Bank* v. *Superior Court,* 28 R. I. 355, this court construes this statute and, at page 358, says: "This statute provides for a record proof of a decision. The record may consist of a docket entry or may be contained in a rescript." There is no rescript in this case. We realize that many cases are decided in the superior court from the bench without rescript, and that the trial justice, in giving his decision in such instances, usually states his "conclusions of law and fact." His conclusions, however, do not become final as a decision until the docket entry thereof is made. It is only then that the trial justice loses control of the case and cannot thereafter review or

change his decision. See *Ashaway National Bank* v. *Superior Court, supra; Bartlett & Co.* v. *Townsend,* 32 R. I. 392.

In the instant case the docket-entry of January 11, 1937, which was the last day of trial, is as follows: "Decision for the plff. for $22.11." This entry represents the real decision of the court. Whatever statements the trial justice may have made concerning his conclusions from the evidence at some other time during the trial, and before the close of all the testimony, was in the nature of comment on the evidence. Until the considered judgment of the trial justice upon all the evidence in the case was entered as his decision on the docket of the court, he was fully warranted in amending, altering, or reversing any conclusion previously expressed by him. In the circumstances of this case, we cannot give the decision of the trial justice sitting without a jury the weight that is usually accorded in this court to such decision.

The record and transcript before us show that the case was fully tried in great detail and with care by both parties in the superior court. This being the case, we would be encouraging needless litigation, inconvenience and expense were we to remit the case to the superior court for a new trial. In our opinion the evidence clearly shows that the defendant entered into an ordinary brokerage agreement in writing with Harris, and further shows by the clear preponderance of the evidence that the plaintiff, acting through Horton with the defendant's knowledge and acquiescence, exercised discretionary control over the defendant's account with Harris. Assuming that there was no express contract between the parties, which is by no means clear, yet there was by the clear preponderance of the evidence, at least an implied agreement to pay to the plaintiff the fair and reasonable value of its services to him. The plaintiff is entitled to the amount of its claim, $900.38.

The plaintiff's exception to the decision of the trial justice is sustained. In view of this conclusion, it becomes unneces-

sary for us to consider the other exceptions of the plaintiff, and they are, therefore, overruled.

The case is remitted to the superior court with direction to enter judgment for the plaintiff for $900.38, as of January 11, 1937.

*Littlefield, Otis & Knowles, James B. Littlefield,* for plaintiff.

*McKiernan, McElroy & Going, Peter W. McKiernan, John C. Going, John S. McKiernan,* for defendant.